I understand that everyone is here. We have some motions which are on submission. So we'll proceed to the first case, United States v. Galanis and Hurst. May it please the Court, my name is Daniel Nooter. I represent the defendant appellate, Mr. Jason Galanis, and with me at the counsel table is Christopher Meddew, who is Mr. Galanis' trial counsel in the Wack-Pomney matter. Mr. Galanis was denied the effective assistance of counsel in the — when his attorney in the Garova matter, Tom Mazzucco, failed to comply with his obligations under Frey to advise him regarding the joint plea agreement that was for the Garova and the Wack-Pomney dispositions together. In particular, he failed to advise him regarding the fact that — that in not taking that disposition, he would have consequences to his criminal history score to increase his guidelines in both the Garova and the — We understand you may have a claim that you wish to pursue along these lines. But why shouldn't we do what we normally do, is leave that to a 22-print petition? Well, for a couple of reasons, Your Honor. First of all, as numerous cases of this Court have held — I mean, after all, the record's not complete here. We don't know what counsel was thinking. Well, to address two things. First of all, I — as I can get into later in the argument, I think — I think that there is a compelling basis to find that, in fact, the record does demonstrate that Mazzucco failed to provide this, and that there's nothing credible that he could or would, in fact, say on remand that would — But while we're on the subject, you'll get later to the notion that we should just reverse and do it ourselves. Okay. But as between a — a remand for further findings, presumably in the — in the — in the first case, the Galanis case — it is Galanis, but the first case. And 2255, what — how do we choose between them? I presume we can do either, can't we? Yes. So the case law is clear that either remand or 2255 are available. And I've cited some cases — But the — my question is, as a matter of reason, why should we do one rather than the other? Three reasons, Your Honor. First, because trying to handle these things in two separate piecemeal 2255 things in two separate cases would be extraordinarily inefficient. Why is that inevitable? You will, in effect, be filing a civil action, right? Well, because — well, he would be having to — A civil action. And it would be — there's certain specific rules, but the pleadings would be controlled by the federal rules of civil procedure, wouldn't they? Well, I think it would still need to go up. He would need a remedy. Ordinarily, the 2255 is referred to the particular judge who handled the criminal conviction. But in this case, there are two separate judges in two separate cases. Are you saying — are you saying that if it went to the first judge, that the judge — I'm sorry. I sat next to me yesterday. Judge Castell. Yes, thank you. Judge Castell would not be able to handle both ends of this? He wouldn't be able to say, yes, you had — you didn't have effective assistance of counsel, and therefore, you get to do both? I don't think he would be able to order the remedy that we've sought, which is the vacator. He had jurisdiction over the case. Why couldn't he do that? Because he — well, I — I don't think — well, I don't know. If this Court said that he could, if this Court were to read it. He doesn't have jurisdiction over Judge Abrams' case. That's what I don't think. Is there a mechanism for us to send both cases back? And we can't direct them to transfer one case so that one judge has both, which is probably what should have been done in the first instance. Well, what I think what this Court can do is simply remand for the further fact finding, and again, the Leono and the Rodriguez cases both suggest that this is a situation — No, we can do it. Yeah. The question is, which should we do? Is there — there's a — there's a Rule 33 motion pending in front of — In front of Judge Castell, which already presents Mr. Galanis' issues and evidence in this case, including — Can we remand to have that motion decided? Yes, and that's — and that's — that's what we are fine with. Are you asking? Yes. We're — we're happy with that. If that's done, all it would require is — is an additional declaration from Mr. Mazzucco. And once that — This is the only issue you're raising on this appeal, right, is the ineffective assistance? Yes. You raised nothing else. Everything else would be barred by the appeal waiver, we believe. Okay. So I don't understand why you can't — when you — when you draft your petition, you — I mean, the federal rules contemplate joining disparate parties. They join — are rather generous in terms of joining related claims. In addition, the Southern District has rules about related cases. I just don't see why this problem that you are terrified about is just — is — is — first of all, it's a — I don't see why it's a problem at all. And second, I don't see — if it is, I don't see why it's difficult. Well, again, for several reasons. One, there's the Rule 33 already pending. Second, this Court's cases suggest that remand rather than 2255 is the better option where, as the Leono case put it, it's not a factually complex issue. Here, it's basically just a matter of Mazzucco providing his, you know, rebuttal affidavit, if any, you know, to — But you're running the risk that something may come out in the other case that affects the first one. And you're running the — you're creating a possibility of inconsistent outcomes. Well, I — respectfully, Your Honor, I — I don't think that there is any such issue because I think the only question for both cases is simply whether or not the constitutionally required advice was given. Mr. — Because one judge decides it's — it was constitutionally ineffective counsel — ineffective assistance, and the other judge decides something — views the evidence differently. Well, Mr. Mazzucco is never in Judge Abrams' court. I mean, that's part — We're sending it back to Judge Castell's court for him to decide whatever he decides. How do we get — how does that somehow have an effect on Judge Abrams' court? It's not before Judge Abrams. How does it have an effect on her sentence? Because, Judge Sack, if this — if this court retains jurisdiction over the matter, then this court can simultaneously order the remedy that we've asked for in both cases. So we would maintain jurisdiction over both appeals? Yes. And simply — So you're asking us to retain jurisdiction over both appeals, remand Judge Castell's case to let him decide the Rule 33? Yes. Then it would come back up, and then we would look at both cases again at that point? Is that — is that the — what you're suggesting? And then — yes. And then either be able to order that joint remedy or — Why is that better than affirming without prejudice to filing a 2255 in both cases? Assuming that you could file a single 2255 involving both cases with respect to both judges. Well, again, I believe, Your Honor, that the — that the Leono and the Rodriguez cases speak to that matter. The Rodriguez case, both talk about the idea — Leono in particular, when there's not a factually complex issue that can be — That's not the point. What is the bar to filing a single 2255 that incorporates both cases? What's the procedural bar to that? I — I suppose there — I think it just complicates the issue of what — of the remedy. The procedural bar would be how to try to plead this so that he could plead an argument that would be able to provide a remedy from the court. You figure that out when you draft the complaint. I mean, we can't draft it for you. No, but, again — Is there any reason why you couldn't file a 2255 that covers both cases? I mean, you may not prefer to, but is there a procedural bar to it? That's our question. I don't — I don't think that there is a procedural bar. I think it would just be — I don't think there would be a procedural bar to the two in the two different cases. One of the problems right now is — is you've got two different district judges, and it's hard to get what you want unless — unless the two judges coordinate. If you file a 2255 that covers both cases but it's one proceeding, it seems to me that you've got a better chance of getting it in front of one judge. Particularly with — in that case, hypothetically, with our order in hand or opinion or decision in hand when you attempt to do it. Again, respectfully, Your Honor, and I realize I'm past my time, but I would respectfully suggest that this proceeding already accomplishes what Judge Parker has — You're just talking. It's just talk, because what we did — what Judge Chin did with you a minute ago is run through the — you know, back to the district court, back here, back to the district court, one judgment to review, another judgment to review on your preferred manner of proceeding. And I can't speak for my colleagues, but I am far from convinced that what you are proposing makes a great deal of sense. Well, respectfully, Judge Parker, sending it back to the district court, where the Rule 33 in the declaration has already been there, really all that needs to be done is to have Mazzucco file a declaration if he's going to file a declaration. It's not — So you say, that's not dispositive. We don't know what else will happen in the proceeding when it goes back down. There may be complications. There may be additional fact-finding. There may be a hearing, et cetera, et cetera. We know what you would prefer to have happen, but unfortunately, that — and I understand that, but that's just not necessarily what is — what will inevitably happen. But respectfully, Your Honor, you're right that it's impossible to entirely foresee what could happen, but it's extraordinarily difficult to imagine that the habeas issue, the 2255, would involve any less of this. Any prejudice to proceeding in that fashion, going by 2255? Well, there is some prejudice in that — and again, this is what the Leona court noted, is that it would use up any 2255 for any related issues that might become known over the year. Exactly. That's to be preferred, certainly by us. There's another possible thing that you haven't raised, and that is that he is entitled to counsel in an appeal, but not necessarily entitled to counsel in a habeas proceeding. Exactly. And especially in this case where, again, I would suggest it requires very little additional things requiring him, and especially when the whole overarching aspect is that he has not had counsel representing him effectively. I think that, you know — I mean, again, irony isn't a legal argument so much, but it would certainly be somewhat ironic to then send him back to have to do this without further counsel. Irony is an excellent legal argument. All right. You have some time for rebuttal. We'll hear from your colleague. Good morning, Your Honors. May it please the Court. My name is Noam Beal for Sher Tramonti, LLP. I represented Gary Hurst at trial, and I represent him on appeal. And with me at counsel table is Justine Harris, who is also trial counsel. The question for the jury at trial was whether Gary Hurst failed to disclose the issuance of shares to a foreign person, Emir Shahini, and whether he did so with fraudulent intent to conceal that the true beneficial owner of those shares was Jason Galanis. That issue was hotly contested. I'm sure it's in the record, but where geographically was Mr. Shahini during this period of time? Mr. Shahini was — he's a resident of Kosovo and Canada. And during the relevant period, he was in either Kosovo or the Czech Republic. So the evidence on that question was close. It was hotly contested and vigorously defended at trial. But Mr. Hurst was denied his right to have a jury fairly decide that question, because the government was allowed to introduce extraneous prejudicial evidence of a separate, unforeseeable fraud that overwhelmed the evidence of Mr. Hurst's guilt or innocence. I'd like to focus my argument this morning on that issue and explain how it worked to deny Mr. Hurst a fair trial and a reasonable sentence. Now, on the core question of whether Mr. Hurst transferred the shares to Shahini with fraudulent intent, as I said, the evidence was highly equivocal and highly debatable. And I want to point out two reasons. First of all, Mr. Hurst's actions in this case were actions he was obligated to take as president of the company and that the company was obligated to do under its contractual obligations. In fact, if Mr. Hurst had not authorized the issuance of the shares in accordance with the warrant agreement — A separate scheme that you are referring to is the monetization of the Shahini shares? It's the pump-and-dump scheme that Jason Galanis undertook with corrupt investment advisors and brokers. Why do you say that's a separate scheme, and why isn't that part of the overall scheme? It's a separate scheme because it was totally unforeseeable and not within the scope of the conspiracy that the government alleged Mr. Hurst agreed to join. Why would Mr. Hurst have done the things he did if he didn't foresee that the shares were going to be pumped and dumped? Well, there was no evidence to suggest that he knew there was going to be a pump-and-dump. The government argues that the shares would have to be monetized in some way, but that's not true for a couple of reasons. And there were other ways to monetize the shares. Who argued that to the jury? Yes. They didn't believe it. Well, they — They didn't buy it. They were not given an opportunity to consider that question because there was overwhelming evidence of a separate pump-and-dump. And that evidence was powerful because it included cooperator testimony. It included emotional victim testimony from individuals whose parents lost their life savings because of Jason Galanis's — What's the legal error that we're supposed to correct? The legal error was that Judge Kestel erred in allowing in evidence of a separate, unforeseeable fraud that overwhelmed the relevant evidence and prejudiced Mr. Hurst. So it's a Rule 401 error and it's a Rule 403 error. We argued both of those in a motion in Limine. We moved to strike the evidence of the separate fraud. And we moved for a new trial on Rule 33 at the close of the government's evidence because of the introduction of that evidence. But how were they going to get their money if they didn't pump and dump? So the evidence showed that everyone in the company was contemplating that a registration statement was going to be filed and all of the shares would have become free trading. That would have created a robust market for these shares. And shares that were held in the hands of a nominee to Jason Galanis, once the Regulation S restriction was lifted, could be sold. So in the same way that anyone receives shares and has — owns something of value and then can share them on the open market, they could be sold that way. And that's, in fact, why — How does the existence of that theoretical possibility, ipso facto, mean that the pump-and-dump scheme was a separate, unforeseeable conspiracy? The reason the — That was what they eventually did, right? That's what — what Jason and — and separate individuals did, without Mr. Hurst's knowledge and with no participation of Mr. Hurst. Right. And the reason that was unforeseeable is twofold. Any benefit from the — from the pump-and-dump to the — Mr. Hurst did not — $2.6 million. He did not benefit from the pump-and-dump in any way, and there was no evidence to suggest that. The $2.6 million issue, which we vigorously disputed that Mr. Hurst received, and we vigorously disputed that it was a debt that he owed, but that money came from a margin loan, from the depositing of the Shaheeni shares in a U.S. brokerage account. This was an issue that was also argued to the jury? That issue was argued to the jury, but the — The jury didn't accept it. The jury was not called upon to decide whether — motive to receive money was not an element, so we don't know what the jury decided about that. The evidence on the $2.6 million was that it came from a margin loan, which is a perfectly legitimate thing to do with shares that are held by a foreign person, and that Jason Galanis deceived Mr. Hurst about the source of those funds. He told Mr. Hurst that $2.6 million was coming from a separate investment venture, and there was no evidence in the record that Mr. Hurst would have known any different. So the evidence that that tied Mr. Hurst to the pump-and-dump in any way was completely lacking. I want to mention also the reason that the registration statement and the fact that all the shares would be registered was a more plausible way to monetize the shares is that explains why the board ratified the issuance of the shares to Shaheeny. Everyone on the board of directors acting as the company understood that the purpose of transferring the shares to Shaheeny was to pay Jason Galanis for his investment banking work for the company. With all of the relevant documents in hand, the board ratified that issuance. They would not have done that if they believed that it was not a legitimate transfer that Mr. Hurst concealed any material information and that that was in any way a problem. The reason... I understand why you did not, that you are arguing to us that you would have been in a much more advantageous position vis-à-vis your client had the evidentiary rulings gone your way. But I think your hurdle here is to articulate why this is an abuse of discretion. In other words, why a rational judge... I mean, it's so far out of the box that a rational jurist wouldn't have made it. I might have agreed with you, Judge Chan or Judge Sack, but why was this an abuse of discretion? I see my time is expiring. Go ahead. It was an abuse of discretion because the evidence on the pump and dump was all based on happenstance, things that happened totally out of the control of individuals in the conspiracy. There was a separate SEC freeze of a separate investment venture and then a match trading scheme that took place after all of the relevant action related to Mr. Hurst. That made it clear that that evidence was not foreseeable and that bringing that evidence into the conspiracy with which Mr. Hurst was charged was wrong on the law of conspiracy and prejudiced Mr. Hurst's right to defend the accusations of his conduct at trial. I'll reserve the rest of my time for rebuttal. Thank you. Thank you. We'll hear from the government. Good morning, Your Honors, and may it please the Court. My name is Brian Blaze. I'm an assistant United States attorney in the Southern District of New York. I represent the United States on appeal and also represented the government in the proceedings below. I'd like to first address Mr. Hurst's argument, and particularly the reasonable foreseeability argument with respect to the disposition of the Shaheeny shares. And I'd like to make three points, which I'll highlight first and then discuss in turn. First, the indictment in this matter alleged a single unified scheme to issue fraudulently the shares to a foreign nominee and to dispose of those shares for the benefit of the conspirators. And that's relevant under this Court's precedence. Two, as a practical matter, this scheme only made sense as a single unified scheme. And third, contrary to what Mr. Beal just argued, Mr. Hurst did profit from the disposition of the Shaheeny shares or from the monetization of the Shaheeny shares. And so it was certainly reasonably foreseeable to him that those shares would be monetized. So to address those points in turn, point one, under — this Court has decided in United States v. Salmonese that when a — when economic benefit or economic profit is the object of a conspiracy, that that conspiracy exists until the profit is realized. And Salmonese also held that, in part, one looks to the indictment to determine the nature and object of the conspiracy at question. As in Salmonese, the indictment in this matter, specifically paragraph 13 of the indictment, alleged that the object of the conspiracy in question was to both issue shares to a foreign nominee and dispose of those shares for the benefit of the conspirators. So under the teaching of Salmonese, this was a single conspiracy and it was relevant. The evidence of both the issuance of the shares to Shaheeny and the subsequent disposition was relevant. The effort here to parse into two separate conspiracies, a share issuance conspiracy and a share disposition conspiracy, is just simply contrary to the teaching of Salmonese. And I think the facts of Salmonese are actually relevant to this case. In many points, they're on par with this case. Now, to be clear, Salmonese is not a reasonable foreseeability case. It's a statute of limitations case. But the nature of that case was the defendants in that case were alleged to have fraudulently obtained securities, in that case warrants that had been stripped from shares that were later pumped and dumped, pumped and dumped. And the defendants in that case argued that the conspiracy was over at the time that they received the securities, very similar to the argument that's being advanced here. And what the Court in Salmonese concluded, what this Court in Salmonese concluded, was, no, in fact, the conspiracy extended to the point where those shares were, in fact, disposed, and that's exactly akin to the situation here. Now, I think that the upshot of Salmonese from a reasonable foreseeability perspective, although it's, as I said, not a reasonable foreseeability case, is that in a conspiracy where the object is to economically profit, which was, in fact, alleged here, it is reasonably foreseeable that a member of the conspiracy would, in fact, take steps to realize that profit, which is, in fact, what happened here. So that's point number one. Point number two is, as a practical— Simple question. Yes. These were subchapter S or whatever shares, and the notion is that they're supposed— when you sell them abroad, and they're supposed to stay abroad, and that's why they're not registered. Is it a fact, or is it your position, that had these shares stayed abroad, this entire plan or conspiracy could not have worked? A couple of responses, Your Honor. Regulation S, which is the SEC-exemptive provision that you're referring to, exempts from registration, so no requirement to file a registration statement, shares that will be sold to non-U.S. persons and disposed of outside of the U.S. market. Now, that resale restriction, and there's testimony at trial, it's on transcript page 181, that that exemptive period ranges, depending on the nature of the security, from 40 days to a year. So it's not a permanent ban on sales into the United States. It is a temporary ban. So it is not the case that this scheme could not have — the very essence of this scheme was not to sell those shares offshore. The essence of the scheme was to sell them here in the United States, which is, in fact, what happened. Does that answer Your Honor's question? I'm not sure it does. What did this defendant do that was part of something that broke the law, if those shares could have stayed? Didn't he have to have some sense that eventually these shares would wind up in the U.S. market in order to be part of it, or am I missing the whole point of it? Your Honor, so I think the essence of the scheme, the purpose of issuing the schemes via — issuing these shares via Regulation S is that they are issued without restriction. So there is no restriction other than this resale restriction under — under Regulation S, which expires after a period of time, unlike the other shares that were being issued by Jarova, which, because they were not being issued pursuant to a registration statement, were restricted and could not be resold in the United States at all, which is, in fact, the shares that the insiders, like Mr. Galanis, Mr. Hearst, held shares in Jarova, but they were fully restricted and couldn't be sold. So the — Is there some backdating here as well? Well, I was going to get to that, Your Honor. There is, contrary to what Mr. Beal argued about the evidence of Mr. Hearst's fraudulent intent being equivocal or sort of close to the line, that's not true. Our brief on pages 62 and 63 actually outlines in a fair amount of detail the evidence presented at trial about Mr. Hearst's fraudulent intent in connection with this scheme, which includes things like documents being backdated. There was significant — substantial evidence at trial that Mr. Shaheeni, the foreign nominee, was, in fact, not recruited into the scheme until days before the shares were issued to him. And then, in fact, there were documents, a consulting agreement and a warrant agreement, that were dated months before Mr. Shaheeni's recruitment in the scheme. Now, those documents purported to compensate Mr. Shaheeni, the foreign nominee, for purportedly making an introduction of an investment opportunity to Jarova. Mr. Shaheeni did not, in fact, make that introduction. There was testimony at trial to that effect. In fact, there was an e-mail sent from one of the co-conspirators, Mr. John Galanis, Jason's father, with the substance of the company that Mr. Shaheeni supposedly introduced. And that e-mail was sent after Mr. Shaheeni had already received his shares. There was also evidence at trial that Mr. Hearst concealed from Jarova's chief financial officer the fact that these shares had been issued. In fact, the testimony at trial was that the chief financial officer, Michael Holofza, did not, in fact, learn about the issuance of these shares until September of 2010, which was more than four months after the share issuance had, in fact, happened, and at a point where three months after Mr. Holofza, the CFO, had had a conversation with Mr. Hearst about the consulting agreement. So they had spoken about the consulting agreement, and Mr. Hearst never told the CFO that, in fact, that consulting agreement had been satisfied by the issuance of $70 million. And to top it all off, there was, I think, a very powerful question as to whether it was $70 million. I don't think there actually is a question about that. There were 5.3 approximately million shares issued to Mr. Shaheeni. On the day that those shares were issued, the shares were trading at approximately $13.50. Just doing the straight math yields a number of approximately 72 million. Now, there was some briefs that, because of the resale restrictions, the actual value of those shares was, in fact, less than $72 million. There was no evidence at trial introduced that, in fact, the value was anything other than the $72 million. And, in fact, the shares were sold at their market value. $19 million of the shares were monetized at their open market value. So I think it is fair, and I don't think it was, in any way equivocal in its conduct, to argue that the shares were worth $72 million. So that's the evidence of Mr. Hearst's fraudulent intent. It's not, I think, in any way equivocal, and I think it was presented to the jury, and the jury made their conclusion as to Mr. Hearst's fraudulent intent. But to get back to the two points, the second point about the reasonable foreseeability is, in fact, the scheme makes no sense without a plan to dispose of the shares. The fraudulent means and methods that I just described for the issuance of the shares make no sense to, in order for Amir Shaheeni, the foreign nominee, to be a long-term holder of Jarova. That was never the intent. The intent of this scheme was to dispose of the shares. That was alleged in the indictment, and that is, in fact, what the ---- Kennedy, disposed of the shares. Sell or get rid of? Sell. Sell the shares. Or, alternatively, and this happened in certain circumstances the shares were margined, and margined loans were taken out, and those margined loans were used for purposes of the conspirators, including, as Mr. Beall mentioned, and which I'll get to in a moment, for the benefit of Mr. Hearst. So this scheme only makes sense as one in which the shares would be disposed. And, in fact, given and this is a point we make in our brief, that the shares represented such a ---- the shares issued to Mr. Shaheeni were such a substantial part of Jarova's public float, i.e., the tradable shares that could, in fact, be sold without restriction, there were approximately half, it was reasonably foreseeable that the only way those shares could be disposed in the face of a relatively illiquid market was through under this Court's precedent in cases like Mittelstadt and its progeny, that the conspirator know of the specific means and methods by which the conspiracy will be carried out, i.e., it's not required that Mr. Hearst know that a specific pump-and-dump scheme would be used. And so, you know, in light of the fact that this scheme really only makes sense as a disposition scheme, I think that's the second reason why Judge Castell didn't abuse his discretion in allowing that evidence. And the third point, and Mr. Beall noted that it's a point of dispute, but it really, at the end of the day, is not, Mr. Hearst profited from the disposition of the Shaheeni shares, so it's certainly reasonably foreseeable that those shares would, in fact, be disposed as part of the scheme. So he received $2.6 million that was the proceeds of a margin loan from the shares that was used to pay down a debt that Mr. Hearst owed to an investor in a hedge fund that he managed. Now, Judge Castell found at sentencing and this is on page 405 and 408 of the appendix, found that, in fact, Mr. Hearst did profit from the scheme, despite the contentions here and in Mr. Hearst's brief that he did not. And that finding is not in any way clearly erroneous. The evidence at trial established that Mr. Hearst did, in fact, profit. The proceeds went from a Shaheeni brokerage account to two credit union accounts for which Mr. Hearst was the sole signatory, and then directed by Mr. Hearst via wire transfer to a Swiss bank account that was associated with the investor in his hedge fund. So clearly, a clear monetary trail that shows that the $2.6 million was used to retire a debt that Mr. Hearst owned, which is certainly a mechanism for him. Retiring a liability is a mechanism for him to profit. So unless there are further questions from the panel with respect to Mr. Hearst's argument, I'd like to briefly touch on Mr. Galanis' argument with respect to the ineffective assistance of counsel claim. We certainly submit that further fact-finding is necessary. We have not heard from Mr. Mazzucco, Mr. Galanis' lawyer, about the nature of the claim so that we should simply affirm. Correct. Well, no, sorry. I — we believe that further fact-finding is necessary, but we believe it can be accomplished through an affirmance of the judgment and a 2255 proceeding at which the ineffective assistance of counsel claim is addressed. Now, to address some of the concerns raised earlier about the appropriate procedural mechanism, there is certainly flexibility under both the civil rules with respect to joinder of claims and with respect to the Southern District's related case procedures in civil cases for these matters to end up in front of a single judge. This Court has — and this is not a case that we cited in our brief, but I think some of the remedy arguments really were only aired for the first time in the reply brief. But in United States v. Doe, which is 365 F. 3rd. 150, this Court has said that the concerns of judicial economy counsel for, in circumstances like this, proceeding in a habeas proceeding so that all of the collateral claims can be raised at the same time. Now — There is some prejudice in the sense that Mr. Galanis would have to use up his 12255, and he may not have a right to counsel. That is correct, Your Honor. And we certainly acknowledge that there is no right to counsel in habeas proceedings, and it would exhaust Mr. Galanis's habeas claims. Now, to be clear, there is a waiver in Mr. Galanis's plea agreement with respect to raising any non-ineffective assistance. What's your objection to doing this the way that Mr. Galanis says should be done? Simply remanding to the district court. Yes. Your Honor, I don't know that we have a strong objection to doing it that way. I think — Do we have any problem with respect to the interrelationship between that case and the Bond case? As a practical matter, I think no. If this case were remanded, if there was a Jacobson remand for the purpose of doing further fact-finding in that case, I think, one, this Court would retain jurisdiction to deal with both matters. But even if not, as a practical matter, if Judge Costell were to find that there were ineffective assistance with respect to the joint offer, the government would certainly consent to Mr. Galanis's withdrawal of his plea in the Bond matter. We would not stand on formalities if there is a finding of ineffectiveness, we would carry out the joint plea offer. Right. You're correct, Your Honor. But again, given this Court's statement in Doe that there is a preference for not doing the back-and-forth of remands and coming back to this Court, we think there is no hurdle to properly and appropriately addressing these matters in a 2255 proceeding or proceedings as necessary, unless there are further questions for the panel. I did have one question. Yes. When the second case was filed in front of Judge Abrams, the government objected to CJA counsel being appointed, I guess, in that first month. I'm just curious, why was there an objection? I mean, so at that — in essence, he was without counsel for about a month in the second case when there was a plea offer pending in that case. I think the objection was that Mr. Galanis refused to fill out a CJA affidavit, and we had reason to believe that he did not qualify for CJA counsel given assets, substantial assets that he — that he owned and maintained. I think that was — that was the reason we — Did he eventually get the CJA? He did eventually fill out a CJA affidavit and did get CJA counsel, Ms. Scolari and Mr. Medue, as co-counsel. So he did eventually fill out the affidavit, but I think our original objection was that it was necessary for him to disclose his assets in order to determine that he qualified. If there are no further questions for the panel, we'd rest on our briefs. Thank you. Thank you. We'll hear the rebuttals. Thank you again, Your Honors. I just wanted to make one additional point that — regarding the remand versus 2255. And I think if you look at the Frye case itself, which is where this all starts, I think it provides a strong argument for why remand would be preferable. Because in the Frye case, one of the concerns for the Supreme Court was, well, how do we know that, you know, some frivolous claim that something, you know, was made won't come down the line afterward? And what the — what the Supreme Court explains is, well, the best way to deal with this, to avoid this future problem, is for all the parties, which includes the government, at any subsequent plea hearing, to make known at that time to the Court the existence of any of these plea offers. Now, it's undisputed that at the plea hearing on July 21st, no one, not Mazzucco, not the government, not anyone, mentions this joint plea hearing in the context of a Rule 11 colloquy, where the entire purpose is to determine, to ascertain whether or not my client has gotten his — his right to counsel. Now, to essentially reward the government with — with an affirmance here, to prejudice my client, even if it's not the world's greatest prejudice, but still to have to file a complicated civil complaint without the benefit of counsel, to exhaust this 2255, even the two years of additional litigation that could have been avoided had this simply been raised at the July 21st, 2016, hearing, I would give a perverse incentive, I suggest, to the government in future cases not to raise these issues at the appropriate time if they knew they would essentially be rewarded with an affirmance down the line by it. So unless you have any additional questions for me, I would end with that argument. Thank you. Thank you. Your Honors, we've heard a lot of argument today about the issues involving Mr. Hurst, and that's precisely what we wanted a trial on. The legal issue for this Court to decide is about the proper scope of conspiracy law, and the government's theory of the conspiracy here essentially has no limit. To address Mr. Blais' point, the fact that this conspiracy was charged in the indictment and that some means of monetizing the shares was charged in the indictment, that does not allow the government to put on evidence of any way, any how, that the shares can be monetized. They still — That was the charged crime, and the jury convicted. But they still must prove foreseeability. And the way that the evidence came in through the testimony of Gavin Hamels was that the pump-and-dump scheme was based on pure happenstance that was not conceived of at the time Mr. Hurst was alleged to have joined the conspiracy. And that is why — But that wasn't the government's theory of the pump-and-dump. That was your argument about it. I understand. But the government must put forward proof of its theory at trial, and they did not prove that the pump-and-dump scheme was a reasonably foreseeable outcome of the conspiracy they allege Mr. Hurst to have joined. Why would he have engaged in the backdating of documents, the fraudulent issue of the shares, if he did not anticipate that they would be monetized and there would be some pumping-and-dumping going on? Crediting the government's theory of all those issues, he could have done it simply to get the shares into the hands of a nominee of Jason Galanis. That's precisely what the evidence showed. And the government could be free to argue that the jury could infer that he did it with fraudulent intent for that reason, and that's why the board ratified the issuance of shares to Shaheeny. Isn't the more plausible explanation for that conduct that he did it with the expectation of some financial gain? The financial gain that the government alleges he received, again, was from margin loads, not from a pump-and-dump scheme. There was no evidence, to Judge Sack's point, there was no evidence presented that Mr. Hurst knew or foresaw that, or could reasonably have foreseen, that the regulation S shares would be sold in the U.S. market through a pump-and-dump scheme, and that's the problem here. I want to briefly address, even if the court finds that it was reasonably foreseeable, there's still the problem on sentencing that Judge Costell did not make a particularized finding under Sentencing Guideline 1B1.3 and this Court's Studley decision that it was part of the jointly undertaken criminal activity. And that matters because Judge Costell used the proceeds from the pump-and-dump as the loss amount to drive the sentencing guidelines way up. If he had considered what was part of Mr. Hurst's jointly undertaken criminal activity, he would have considered only the loss based on the issuance of the shares to Shaheeni and the loss to the company related, which would have been $2 million, or we submitted with our sentencing submission a Black-Scholes analysis that showed that the shares were actually worth $1.19 million because they could not be sold on the U.S. market. For those reasons, the judgment of conviction and sentence should be vacated. Thank you, gentlemen. Thank you. We will reserve decision.